1  GREENBERG TRAURIG, LLP
   Colin W. Fraser (SBN CA 266867)
2  frasercw@gtlaw.com
   Tyler R. Andrews (SBN CA 250686)
3  andrewst@gtlaw.com
   18565 Jamboree Road, Suite 500
4  Irvine, California 92612
   Telephone: 949.732.6500
5  Facsimile: 949.732.6501

6  Attorneys for Plaintiff
   APPLIED BIOLOGICAL LABORATORIES, INC.

7

8                    UNITED STATES DISTRICT COURT

9            FOR THE SOUTHERN DISTRICT OF CALIFORNIA

10                       SAN DIEGO DIVISION

11

| | |
|---|---|
| APPLIED BIOLOGICAL LABORATORIES, INC., | CASE NO. '20CV2500 AJB LL |
| Plaintiff, | **COMPLAINT** |
| v. | **1. VIOLATION OF DEFEND TRADE SECRETS ACT** |
| DIOMICS CORPORATION, a Delaware corporation; ANTHONY ZOLEZZI, an individual, and DOES 1-50, inclusive, | **2. VIOLATION OF CALIFORNIA UNIFORM TRADE SECRET ACT** |
| Defendants. | **3. VIOLATION OF CAL. BUS. & PROF. CODE SECTION 17200** |
| | **JURY TRIAL DEMANDED** |

COMPLAINT

Plaintiff Applied Biological Laboratories, Inc. ("Applied Bio"), by and through its attorneys, and for its Complaint against Diomics Corporation ("Diomics") and Anthony Zolezzi ("Zolezzi") (collectively, "Defendants"), hereby alleges as follows:

## I.   INTRODUCTION

1.      This is an action for trade secret misappropriation and unfair competition relating to Applied Bio's groundbreaking nasal spray technology that prevents the contraction and infection of viruses. Applied Bio strongly believes in the benefits of fair competition, particularly in the field of healthcare. Antiviral products like that developed by Applied Bio have the potential to transform traditional cold and flu relief for millions of people, and to prevent infection from novel pathogens like COVID-19, as part of a multi-billion-dollar industry. Fair competition spurs new technical innovation, but what has happened here is not fair competition. Instead, Defendants Diomics and Zolezzi have taken Applied Bio's intellectual property so they could avoid incurring the risk, time, and expense of independently developing their own technology. Ultimately, this calculated theft allowed Diomics to announce a competing product based on Applied Bio's intellectual property, all at Applied Bio's expense.

2.      Applied Bio developed its groundbreaking antiviral nasal spray technology to address a significant unmet public health opportunity. Applied Bio's product (the "Product") is a powerful and natural solution designed to serve the unmet challenges of preventing and curing common respiratory diseases. A single application to the mouth and nostrils guards selectively against, and remedies ailments caused by, the most common strands of rhinovirus and influenza virus, while also inactivating other respiratory pathogens such as coronavirus. The Product inactivates, traps, and promotes the natural flushing of pathogens and foreign particles to the digestive tract where they are degraded and rendered inactive. Since the Product serves to augment natural molecules in the mucus, it leaves intact the health of the microbiome of the mouth and nose. The Product is poised to become the only commercially-available product to effectively target rhinovirus and influenza virus.

ACTIVE 52817708v3

3.     With a goal of bringing nasal antigen sprays to the mass market, Applied Bio has invested hundreds of thousands of dollars and thousands of hours of research and development time to develop the first nasal spray that selectively, effectively, and naturally prevents the contraction of rhinovirus and influenza. Based on years of scientific research on the mechanism behind respiratory infections and allergies, Applied Bio determined the pathogens' main points of entry into a host and developed the means to prevent hosts from contracting the pathogens. Applied Bio's patented formulations are manufactured through proprietary biotechnological processes to locally augment the body's own natural defense mechanisms and provide a barrier to guard against or substantially interfere with infections. Traditional cold and flu relief medications, while effective at temporarily addressing individual symptoms are ineffective at addressing the source of the disease. There are no cold remedies on the market, and the antiviral flu remedies that are available can have serious side-effects and are not routinely prescribed as a result. Similarly, influenza vaccines are not always effective against every strain of influenza and are not recommended for all populations. In contrast, studies show that Applied Bio's antiviral nasal spray technology is superior both in efficacy and safety to any product on the market and even those that failed to enter the market because of the safety concerns of the Food and Drug Administration ("FDA").

4.     Applied Bio recently learned that Diomics is developing an antiviral nasal spray that bears a striking resemblance to Applied Bio's own highly confidential and proprietary technology and reflects Applied Bio's trade secrets. Diomics issued a press release in September of 2020 claiming that its product, Dioguard™, is intended to "create a durable barrier of antibodies in the nasal cavity to capture, bind to and neutralize the SARS-CoV-2 virus before it can reach and enter the cells that cause infection." The Diomics press release further states, "Creating a protective shield that blocks the virus at its crucial first point of entry into the body—the nasal passages—fills a huge void in the race to develop an effective vaccine for COVID-19." The press release continues, "'A preventative nasal spray that effectively neutralizes SARS-CoV-2 before it can cause

infection we believe holds the key to allowing many aspects of life to resume until the day comes when there's an effective vaccine in widespread use,' Diomics CEO Anthony Zolezzi said." Diomics plans to seek fast track authorization from the FDA to accelerate human trials of its Dioguard™ product.

5.     Applied Bio believes that Zolezzi misappropriated more than 90 highly confidential and proprietary files belonging to Applied Bio that Zolezzi obtained while working at his former firm, Pegasus Capital Advisors L.P. ("Pegasus"), which had considered a strategic partnership with Applied Bio in 2017 and 2018. The files include a wide range of highly confidential files, including Applied Bio's detailed 50-page business plan and documents disclosing Applied Bio's scientific testing results, experimental designs, patent applications, formulations, manufacturing processes, and marketing strategies. Zolezzi then improperly disclosed to Diomics the results of Applied Bio's resource-intensive research.

6.     Instead of developing their own technology in this new space, Defendants stole Applied Bio's long-term investments and property. While Applied Bio developed its antiviral nasal spray technology with sustained effort over many years, Defendants leveraged stolen information to shortcut the process and purportedly build a comparable and/or competing product in just months.

7.     In light of Defendants' misappropriation of Applied Bio's antiviral nasal spray technology, Applied Bio brings this Complaint to prevent any further misuse of its proprietary information, to prevent Defendants from harming Applied Bio's reputation by misusing its technology, to protect the public's confidence in the safety and reliability of antiviral nasal spray technology that Applied Bio has long sought to nurture, and to obtain compensation for its damages and for Defendants' unjust enrichment resulting from their unlawful conduct.

## II.  PARTIES

8.     Plaintiff Applied Biological Laboratories, Inc. is a corporation organized and existing under the laws of the State of New York with its principle place of business

located in New York, NY 11226. Applied Bio is a biotechnology company committed to the research, development, manufacturing, and distribution of healthcare products. Applied Bio owns all the trade secrets and confidential information misappropriated or disclosed in breach of confidentiality agreements by Defendants.

9.     Defendant Diomics Corporation is a Delaware corporation with its principal place of business located at 10581 Roselle Street, Ste 120, San Diego, CA, 92121-1521. At times relevant to this dispute, Zolezzi was acting both in his individual capacity and in his capacity as an executive and employee of Defendant Diomics.

10.     Applied Bio is informed and believes that Defendant Anthony Zolezzi is an individual domiciled in Palm Beach County, Florida and is a citizen of Florida.

11.     Applied Bio is currently unaware of the true names and capacities, whether individual, corporate, associate, or otherwise, of defendants sued herein as Does 1 through 50, inclusive, and Applied Bio therefore sues these Doe defendants by fictitious names. Applied Bio will amend its Complaint by asserting their true names and capacities following determination of such names and capacities. Applied Bio is informed and believes, and on that basis alleges, that fictitiously named defendants are each responsible in some manner for the harms and conduct alleged in this Complaint, and that Applied Bio suffered harm, as alleged herein by such defendants.

12.     Applied Bio is informed and believes that each Defendant acted in all respects pertinent to this action as the agent of the other Defendant, carried out a joint scheme, business plan or policy in all respects pertinent hereto, and that the acts of each Defendant are legally attributable to each of the other Defendants.

## III.   JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction over Applied Bio's claims under the Defend Trade Secrets Act pursuant to 18 U.S.C. § 1836-39 *et seq.* and 28 U.S.C. §§ 1331. The Court has supplemental jurisdiction over the state law claims alleged in this Complaint pursuant to 28 U.S.C. § 1367.

14.   As set forth above, at least one Defendant resides in this judicial district. In addition, a substantial part of the events or omissions giving rise to the claims alleged in this Complaint occurred in this judicial district. Venue therefore lies in the United States District Court for the Southern District of California pursuant to 28 U.S.C. §§ 1391(b)(1) and (b)(2).

15.   A substantial part of the events giving rise to the claims alleged in this Complaint occurred in the County of San Diego.

## IV.   FACTUAL ALLEGATIONS

### A.   Applied Bio Develops the First Anti-Viral Nasal Spray

16.   The current approach to managing upper respiratory infections primarily involves agents to reduce symptoms alone. Different treatments are recommended for different symptoms, such as decongestants for mucus production, acetaminophen for fever and headache, and syrups for coughs. Though these approaches provide mild symptomatic relief, they have not been shown to effectively reduce the severity and duration of the diseases. These treatments can also damage the epithelial barrier in the respiratory tract and thereby increase susceptibility to secondary infections. For example, seemingly-innocuous nasal saline sprays can damage nasal membrane's epithelial barrier, resulting in increased permeability to other pathogens. The lack of effective treatments that target viral respiratory infections has also contributed to the widespread use of antibiotics and the alarming emergence of antibiotic resistance.

17.   An effective cure against these upper-respiratory infections will address the pathogens that cause infection and the inflammatory response that causes many of the undesirable side-effects and is factored into the clinical outcome score. There are no antiviral agents approved for the prevention or treatment of rhinovirus infection (*i.e.*, the common cold), and most rhinovirus remedies are single ingredients targeting the virus, but not the inflammatory response, so they do little to lower the clinical symptom score. The only three antiviral medications approved for the treatment of influenza (*i.e.* the flu) have significant systemic side effects that preclude their widespread use.

18.     Applied Bio's valuable and confidential research has determined that respiratory infections typically occur when airborne pathogens come into contact with mucous membranes (*e.g.*, nasal membranes, nasal hairs, esophageal membranes, and the like) via inhaled aerosol droplets. Inhalation of airborne pathogens through the nose is a primary cause of respiratory disease. The nasal passages are not as effective in preventing disease as the mouth, which is better at trapping and killing microorganisms. Airborne pathogens may enter the lungs after nasal inhalation, or bind to receptors found on nasal and other membranes throughout the upper and lower respiratory tracts, which serve as an entry points by which pathogens, allergens, or irritants may enter the bloodstream and cause infection or allergic reaction. Unfortunately, there is no convenient, effective way to minimize or prevent infection or allergy by inhaled airborne microorganisms.

19.     Applied Bio's valuable and confidential research has also addressed the inflammatory cascade that underlies upper respiratory diseases after viruses gain entry to respiratory epithelia. In healthy people, molecules in the nasal mucosa protect against pathogens and modulate the immune response to infection. Some do double duty as anti-inflammatory agents. Many symptoms associated with respiratory diseases are the result of the inflammatory process, rather than the pathogens themselves.

20.     Applied Bio discovered that certain naturally-occurring (*i.e.*, non-synthetic) protein molecules could create a barrier to prevent viruses from attaching to the receptors on the exterior of cells in the respiratory tract when the proteins are introduced at certain concentrations and are protected against denaturing. The proteins mimic the most common binding sites along the oral and nasal respiratory tract, specifically preventing rhinovirus and influenza from binding to their target receptors, while also serving as a "catch-all" barrier for other respiratory microbials. Applied Bio made this discovery using novel *ex vivo technology* that allows Applied Bio to expose live nasal cells in a laboratory environment to a proprietary formulation developed by Applied Bio. Using this process, Applied Bio has proven for the first time that the intranasal administration of naturally-

occurring human proteins provides an effective barrier against virus contraction and infection.

21.     Applied Bio has developed its antiviral nasal spray technology, including the Product, based on its valuable confidential scientific testing and results. Applied Bio also applied for a patent on certain aspects of its antiviral nasal spray technology in 2017: United States Patent Application Ser. No. 15/442,604, entitled "Compositions and Methods for Protecting Against Airborne Pathogens and Irritants."

22.     Unlike previous upper respiratory therapies and products, the antiviral nasal spray technology, including the Product, targets both pathogen and inflammation to meet the requirement of any successful remedy to produce anti-viral effects, decrease the clinical symptom score, and cause minimal side-effects. The Product contains ingredients that interfere with viruses binding to their receptor sites on respiratory epithelia, as well as general antimicrobial and anti-inflammatory ingredients. These ingredients help control the inflammatory response and strengthen the epithelial barrier which will further protect against viral and secondary bacterial infection. The ingredients also help to manage the clinical symptoms of respiratory disease, the most pronounced of which are lower mucociliary clearance (one component of congestion), lower cilia beat frequency (another component of congestion), mucin secretion (runny nose), and transepithelial electrical resistance (or TEER, which is a measure of epithelial barrier integrity).

23.     While making these fundamental advances in antiviral nasal spray technology, Applied Bio also accumulated confidential and proprietary intellectual property that it uses in the implementation and manufacture of the Product to optimize performance, maximize safety, and minimize cost. Applied Bio also created a vast amount of confidential and proprietary intellectual property through its exploration of concepts that ultimately proved ineffective, unsafe, too expensive, or otherwise unworkable for the mass market. Applied Bio's extensive experience with "dead-end" concepts continues to inform the ongoing development of Applied Bio's antiviral nasal spray technology. The details actually used in Applied Bio's antiviral nasal spray technology, as well as the

lessons learned from Applied Bio's years of research and development, constitute trade secrets that are highly valuable to Applied Bio and would be highly valuable to any competitor in the antiviral nasal spray space.

24.    Applied Bio's substantial and sustained investment in antiviral nasal spray technology over many years—and the intellectual property that resulted—have made Applied Bio's current antiviral nasal spray technology the most advanced in the industry. It is unparalleled in performance and safety in preventing contraction and infection of rhinovirus and influenza. For these reasons and others, Applied Bio's antiviral nasal spray technology and the intellectual property associated with it are some of Applied Bio's most valuable assets.

**B.    Unbeknownst to Applied Bio, Zolezzi Lays the Foundation for Defendants to Steal Applied Bio's Intellectual Property Rather than Compete Fairly in the Antiviral Nasal Spray Space**

25.    Applied Bio began communicating with Pegasus and Pegusus' affiliate, PanTheryx, Inc. ("PanTheryx"), in 2017 to explore business opportunities related to Applied Bio's development of antiviral nasal spray technology. Pegasus is a private equity fund manager. PanTheryx is a nutrition and biotechnology company focused on health conditions related to the gastro-intestinal microbiome. As the Operating Partner of Pegasus, Zolezzi was extensively involved in the ten-month process during which Pegasus and PanTheryx explored business opportunities with Applied Bio.

26.    Applied Bio took steps to protect its confidential, proprietary, and trade secret information as it explored business with Pegasus, PanTheryx, and Zolezzi. Applied Bio required Pegasus and PanTheryx to execute non-disclosure agreements (the "Pegasus NDA" and "PanTheryx NDA," respectively, and together, the "Non-Disclosure Agreements") pursuant to which Pegasus and PanTheryx agreed, on behalf of themselves and their representatives (including Zolezzi), not to use Applied Bio's confidential, proprietary, and trade secret information for any purpose other than to evaluate and engage in discussions concerning the parties' potential business opportunity together. The Non-Disclosure Agreements applied to all of Applied Bio's confidential, proprietary, and

ACTIVE 52817708v3

trade secret information, including but not limited to (i) the formulations of its products and proposed products, including the identification of each ingredient in a formulation and the quantity of each ingredient; (ii) Applied Bio's methods of manufacturing, developing, and producing products, proposed products, and the ingredients within them; (iii) the mechanism of action and description of the mechanism of action of Applied Bio's products, proposed products, and formulations; (iv) the non-public patent applications filed by Applied Bio or its principles and all communications with government personnel about the applications; (v) information about every scientific test or study that Applied Bio has carried out, intended to carry out, or may yet carry out, including contracts with contract research organizations, study protocols, informed consent forms, raw data acquired during the study, investigational new drug applications filed with the FDA, and study reports, except to the extent it is published or with the consent of Applied Bio; and the names of each supplier used in connection with Applied Bio's products.

27.    Applied Bio implemented a document control system that limits only authorized persons with company-issued user names and current passwords to access Applied Bio's computer systems and electronic document repositories. Applied Bio created a password-protected electronic document repository (*i.e.,* the "Dataroom") containing Applied Bio's confidential, proprietary, and trade secret information concerning its scientific research, finances, and corporate organization. The Dataroom contained more than 90 confidential and protected files with Applied Bio's trade secret information, including:

    a.  Applied Bio's detailed, 50-page business plan concerning the development, production, marketing, and regulatory pathway of Applied Bio's antiviral nasal spray technology.

    b.  The product development plan for Applied Bio's anti-viral nasal spray technology.

    c.  The results of clinical trials Applied Bio had performed on its anti-viral nasal spray technology, including the results of the first set of blind

randomized studies and the results of the repeat blind randomized studies.

d.  Applied Bio's report and supporting materials detailing the mechanism of action of the active molecules in its anti-viral nasal spray technology.

e.  Applied Bio's manufacturing plans for its anti-viral nasal spray technology, including the dimensions of certain products, its list of major suppliers, its list of all suppliers and vendors, and the Material Safety Data Sheets for ingredients within its products.

f.  Applied Bio's costing, pricing, and labelling information for its anti-viral nasal spray technology, including a cost analysis, a presentation of the pricing of its products, and the detailed labelling plans for its products.

g.  Applied Bio's sales and marketing plan and target retail accounts for its anti-viral nasal spray technology.

h.  Applied Bio's agreements with the three contract manufacturing organizations that then provided Applied Bio with pharmaceutical development services from drug development through drug manufacturing.

i.  Applied Bio's corporate organizational documents, including its organization chart, bylaws, board consents, stockholder's consents, board meeting minutes, stockholders' agreements, and stock purchase agreements.

j.  Applied Bio's financial documents, including its capitalization table and documents related to its "Series A" financing round.

28.    In November 2017, subject to the Non-Disclosure Agreements, Applied Bio first provided access to the Dataroom to Zolezzi, Pegasus Founder and Co-Managing Partner Craig Cogut, and Pegasus' team of scientists. Pegasus specifically placed Zolezzi

in charge of managing the due diligence of Applied Bio that was conducted by Pegasus' scientists. Cogut advised Applied Bio that Zolezzi would "take the lead with the doctors on the science." Applied Bio coordinated directly with Zolezzi during the due diligence process subject to the Non-Disclosure Agreements, including by sending Zolezzi emails containing confidential and protected documents, holding telephone conversations with Zolezzi, and holding in-person meetings with Zolezzi.

29.     Over the course of ten months, Applied Bio held many meetings with Pegasus' and PanTherxy's representatives, including Zolezzi, at which Applied Bio discussed its confidential and proprietary antiviral nasal spray technology subject to the Non-Disclosure Agreements. These meetings were intended to demonstrate that Applied Bio's antiviral nasal spray technology was not only a great idea but also a safe and effective means of preventing illness. Zolezzi frequently asked questions at these meeting about the proteins and ingredients that Applied Bio was using in its research, including Lactoferrin and Lysozyme. Applied Bio also discussed with Pegasus, PanTheryx, and Zolezzi the use in antiviral nasal spray technology of immunoglobulin G ("IgG"), which is now the antigen being used by Diomics in its Dioguard product. The information acquired at these meetings represented a substantial leap forward for Pegasus, PanTheryx, and Zolezzi because Applied Bio's antiviral nasal spray technology took extensive time, money, and scientific expertise to develop, on which Pegasus, PanTheryx, and Zolezzi would not need to expend resources because of Applied Bio's work.

30.     In August of 2018, Applied Bio provided Pegasus and Zolezzi with detailed answers and supporting documents (subject to the Non-Disclosure Agreements) in response to a list of questions Pegasus asked as part of its due diligence of Applied Bio. In these responses, Applied Bio included the following confidential and protected information with Applied Bio's trade secret information, including:

      a.  Product research and development information, including unit economic data for Applied Bio's anti-viral nasal spray products, results of Applied Bio's pre-clinical and clinical trials, the design of pre-

clinical and clinical studies on ingredients in Applied Bio's anti-viral nasal spray products, and the names of third-party organizations that would conduct clinical studies of Applied Bio's anti-viral nasal spray products, and the scope and approximate cost of clinical studies of Applied Bio's anti-viral nasal spray products.

b. Supply chain information, including a list of suppliers, prices, and key contract terms; a list of the contract manufacturing organizations and contract research organizations retained by Applied Bio for product development and packaging development; and detailed pricing and customer information for Applied Bio's anti-viral nasal spray products.

c. Strategic relationship information, including the names of fifteen companies with whom Applied Bio was discussing developing business relationships to exploit its anti-viral nasal spray technology.

d. Corporate information about its organizational structure, capitalization table, and previous financing rounds.

e. Employment information, including a list of all existing employees; the employees' salaries, hiring dates, and roles; the accounts associated with each member of Applied Bio's sales team; the individuals earmarked for future positions post funding; the open positions to be filled; and the budgets and salaries for future employees.

31. Ultimately, Applied Bio decided not to enter into a business relationship with Pegasus, PanTheryx, or Zolezzi and the parties ceased discussing business opportunities in 2018.

**C. Defendants Misappropriate Applied Bio's Intellectual Property and Diomics Publicly Launches "DioGuard" with Zolezzi at the Helm**

32. Whereas Applied Bio began developing antiviral nasal spray technology many years ago, Diomics' first serious foray into the field was not until March of 2020, when Diomics hired Zolezzi as its Chief Executive Officer. Before then, Diomics'

ACTIVE 52817708v3

business was focused on producing products to collect and analyze biological samples. And Zolezzi's only experience with antiviral nasal spray technology came from his confidential discussions with Applied Bio. However, unbeknownst to Applied Bio at the time, Diomics and Zolezzi were secretly preparing to launch a competing antiviral nasal spray product using Applied Bio's confidential, proprietary, and trade secret information. Diomics' product would be called "DioGuard™."

33.     Diomics issued a press release on September 8, 2020 announcing its DioGuard™ product with the headline, "Diomics Aims to Nose Out Coronavirus Ahead of Vaccines With Nasal Spray That Delivers Monoclonal Antibody Protection." The press release provided, "The Dioguard™ prophylactic spray, which is now undergoing in vitro testing, pairs Diomics' proprietary synthetic biopolymer material with human IgG monoclonal antibodies licensed from another San Diego-area company, Active Motif, Inc., a leader in epigenetic research. The goal is to create a durable barrier of antibodies in the nasal cavity to capture, bind to and neutralize the SARS-CoV-2 virus before it can reach and enter the cells that cause infection." The press release attributed the following quote to Zolezzi: "A preventative nasal spray that effectively neutralizes SARS-CoV-2 before it can cause infection we believe holds the key to allowing many aspects of life to resume until the day comes when there's an effective vaccine in widespread use."

34.     By September of 2020, Diomics revamped its website (https://diomics.com/) to claim a new market focus. Diomics' website claimed, as recently as August of 2020, that Diomics focused only on two products—a proprietary bio-polymer that captures biological material and delivers compounds to improve hearing, and a suite of rejuvenating biological compounds that deliver growth factors and healing cytokines. Diomics overhauled its website in September of 2020 to announce a new market focus— "an intra-nasal system that couples IgG antibodies with Diomat$^{TM}$ nanobeads to enable a passive prophylactic therapy."

35.     Diomics sudden development and quick public launch of DioGuard$^{TM}$, as well as its transition into an entirely new product market, within a matter of months of

hiring Zolezzi all caused Applied Bio grave concern regarding the possible misuse of its intellectual property. Accordingly, in September, October, and November of 2020, Applied Bio investigated the events surrounding Zolezzi's acquisition of Applied Bio's intellectual property, Diomics' hiring of Zolezzi, and Diomics' development of DioGuard™.

### D. Applied Bio Has Been, and Will Be, Severely Harmed by Defendants Misappropriation of Applied Bio's Confidential and Proprietary Trade Secret Information

36.     Applied Bio developed its patented inventions and trade secrets at great expense, and through years of painstaking research, experimentation, and trial and error. If Defendants are not enjoined from their misappropriation and further breach of their non-disclosure obligations, they will cause severe and irreparable harm to Applied Bio.

37.     The markets for antiviral nasal spray technology are nascent and on the cusp of rapid development. The impending period of drastic market growth, as antiviral nasal spray technology is increasingly commercialized, will set the competitive landscape for the industry going forward. The growth, profitability, and even survival of individual firms will likely be determined by what happens in the next few years. Defendants' exploitation of stolen intellectual property greatly harms Applied Bio during this embryonic market formation process and deforms the creation of a fair and competitive industry.

38.     With respect to Applied Bio's trade secrets, there is also the threat that Applied Bio's confidential and proprietary information will be disclosed by Defendants, which will destroy the trade secret value of the technology. This may occur either voluntarily by Defendants for their own publicity purposes or because a regulatory agency requires disclosure for permitting purposes.

39.     With this action, Applied Bio seeks to vindicate its rights, prevent any further misuse of its confidential, proprietary, and trade secret information, and obtain compensation for its damages and for Defendants' unjust enrichment resulting from their unlawful conduct.

## V.    CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION

**Misappropriation of Trade Secrets in Violation of the Defend Trade Secrets Act**

**(18 U.S.C. § 1836, *et seq.*)**

**Against All Defendants**

40.    Applied Bio incorporates all of the above paragraphs as though fully set forth herein.

41.    Applied Bio owns and possesses certain confidential, proprietary, and trade secret information, as alleged above. One example of the trade secret information is reflected in Applied Bio's detailed business plan contained in certain files that Zolezzi obtained from Applied Bio. Various aspects of the business plan are Applied Bio's trade secrets, including but not limited to the formulations of its products and proposed products; its methods of manufacturing, developing, and producing products, proposed products, and the ingredients within them; the mechanism of action of Applied Bio's products, proposed products, and formulations; the non-public patent applications filed by Applied Bio or its principles; information about every scientific test or study that Applied Bio has carried out; and the names of each supplier of ingredients for inclusion by Applied Bio in its products. Applied Bio's trade secret information is also contained in the confidential and protected documents Defendants obtained as described in paragraphs 26 and 29 above.

42.    Applied Bio's asserted trade secrets are different than Applied Bio's patent rights to its antiviral nasal spray technology. By way of example: The 2017 Applied Bio patent application is directed to pharmaceutical compositions, such as nasal sprays, for prophylaxis or treatment of respiratory infections.  The claimed compositions generally contain soluble ICAM-1 (or an ICAM-1 inhibitor), sialic acid, lysozyme, and lactoferrin. The pre-clinical data contained in the 2017 patent application concerns the effects of these ingredients on the viral replication rate of human rhinovirus A16 and influenza A H1N1 as well as the integrity of the infected mucosa. The 2017 patent application also describes

a novel vehicle for delivering these and other active agents to the nasal mucosa. In contrast, Applied Bio's trade secrets include specific parameters, measurements, formulations, and plans for Applied Bio's antiviral nasal spray technology that are *not* disclosed in any Applied Bio patents. Examples of Applied Bio's trade secret information that are not covered or disclosed by any Applied Bio patents include (i) Applied Bio's business plan for the development, production, marketing, and regulatory pathway of Applied Bio's antiviral nasal spray technology; (ii) the results of clinical trials Applied Bio performed on its anti-viral nasal spray technology; (iii) the product development plan for Applied Bio's anti-viral nasal spray technology; (iv) Applied Bio's manufacturing plans for its anti-viral nasal spray technology; (v) Applied Bio's costing, pricing, and labelling information for its anti-viral nasal spray technology; (vi) Applied Bio's sales and marketing plan and target retail accounts for its anti-viral nasal spray technology; (vii) Applied Bio's agreements with the contract manufacturing organizations that then provided Applied Bio with pharmaceutical development services from drug development through drug manufacturing; (viii) Applied Bio's supply chain information, including a list of suppliers, prices, and key contract terms; (ix) Applied Bio's strategic relationship information, including the names of the companies with whom Applied Bio was developing business relationships to exploit its anti-viral nasal spray technology; (x) employment information, including a list of all existing employees; the employees' salaries, hiring dates, and roles; the accounts associated with each member of Applied Bio's sales team; the individuals earmarked for future positions post funding; the open positions to be filled; and the budgets and salaries for future employees; and (xi) Applied Bio's research and exploration of "dead-end" concepts that ultimately proved ineffective, unsafe, too expensive, or otherwise unworkable for the mass market.

43.     Applied Bio's confidential, proprietary, and trade secret information relates to products and services used, sold, shipped, and/or ordered in, or intended to be used, sold, shipped, and/or ordered in, interstate or foreign commerce.

44.     Applied Bio has taken reasonable measures to keep such information secret and confidential.

45.     Applied Bio has at all times maintained stringent security measures to preserve the secrecy of its antiviral nasal spray technology. For example, Applied Bio restricts access to confidential and proprietary trade secret information to only those who "need to know." That is, employees, contractors, consultants, vendors, manufacturers, and existing or potential business partners working, advising, or consulting on projects unrelated to antiviral nasal spray technology have not had, and do not have, access to Applied Bio's confidential and proprietary information on the subject. All networks hosting Applied Bio's confidential and proprietary information have been and continue to be encrypted and have at all times required passwords and dual-authentication for access. Computers, tablets, and cell phones provided to Applied Bio employees are encrypted, password protected, and subject to other security measures. And Applied Bio secures its physical facilities by restricting access and then monitoring actual access with security cameras and guards.

46.     Applied Bio also requires all employees, contractors, consultants, vendors, manufacturers, and existing or potential business partners to sign confidentiality agreements before any confidential or proprietary trade secret information is disclosed to them. Every outside vendor or manufacturer that has received confidential and proprietary trade secret information related to Applied Bio's antiviral nasal spray technology has executed at least one written non-disclosure agreement to protect that information.

47.     Due these security measures, Applied Bio's confidential and proprietary trade secret information is not available for others in the industry to use through any legitimate means.

48.     Applied Bio's confidential, proprietary, and trade secret information derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by, another person who could obtain economic value from the disclosure or use of the information.

49.     In violation of Applied Bio's rights, Defendants misappropriated Applied Bio's confidential, proprietary, and trade secret information in the improper and unlawful manner alleged herein. Defendants' misappropriation of Applied Bio's confidential, proprietary, and trade secret information was intentional, knowing, willful, malicious, fraudulent, and oppressive. Defendants have attempted and continue to attempt to conceal their misappropriation.

50.     On information and belief, if Defendants are not stopped, Defendants will continue to misappropriate and use Applied Bio's trade secret information for their own benefit and to Applied Bio's detriment.

51.     As the direct and proximate result of Defendants' conduct, Applied Bio has suffered and, if Defendants' conduct is not stopped, will continue to suffer, severe competitive harm, irreparable injury, and significant damages, in an amount to be proven at trial. Because Applied Bio's remedy at law is inadequate, Applied Bio seeks, in addition to damages, permanent injunctive relief to recover and protect its confidential, proprietary, and trade secret information and to protect other legitimate business interests. Applied Bio's business operates in a competitive market and will continue suffering irreparable harm absent injunctive relief.

52.     Applied Bio has been damaged by all of the foregoing and is entitled to an award of exemplary damages and attorney's fees.

## SECOND CAUSE OF ACTION

### Misappropriation of Trade Secrets in Violation of
### California Uniform Trade Secrets Act
### (Cal. Civ. Code, § 3426 *et seq.*)
### Against All Defendants

53.     Applied Bio incorporates all of the above paragraphs as though fully set forth herein.

54.     Applied Bio' technical information, designs, and other "know how" related to its antiviral nasal spray technology constitute trade secrets as defined by California's

Uniform Trade Secrets Act. Applied Bio owns and possesses certain confidential, proprietary, and trade secret information, as alleged above. One example of the trade secret information is reflected in Applied Bio's detailed business plan contained in certain files that Zolezzi obtained from Applied Bio. Various aspects of the business plan are Applied Bio's trade secrets, including but not limited to the formulations of its products and proposed products; its methods of manufacturing, developing, and producing products, proposed products, and the ingredients within them; the mechanism of action of Applied Bio's products, proposed products, and formulations; the non-public patent applications filed by Applied Bio or its principles; information about every scientific test or study that Applied Bio has carried out; and the names of each supplier of ingredients for inclusion by Applied Bio in its products. Applied Bio's trade secret information is also contained in the confidential and protected documents Defendants obtained as described in paragraphs 26 and 29 above.

55.     Applied Bio's asserted trade secrets are different than Applied Bio's patent rights to its antiviral nasal spray technology. By way of example: The 2017 Applied Bio patent application is directed to pharmaceutical compositions, such as nasal sprays, for prophylaxis or treatment of respiratory infections. The claimed compositions generally contain soluble ICAM-1 (or an ICAM-1 inhibitor), sialic acid, lysozyme, and lactoferrin. The pre-clinical data contained in the 2017 patent application concerns the effects of these ingredients on the viral replication rate of human rhinovirus A16 and influenza A H1N1 as well as the integrity of the infected mucosa. The 2017 patent application also describes a novel vehicle for delivering these and other active agents to the nasal mucosa. In contrast, Applied Bio's trade secrets include specific parameters, measurements, formulations, and plans for Applied Bio's antiviral nasal spray technology that are *not* disclosed in any Applied Bio patents. Examples of Applied Bio's trade secret information that are not covered or disclosed by any Applied Bio patents include (i) Applied Bio's business plan for the development, production, marketing, and regulatory pathway of Applied Bio's antiviral nasal spray technology; (ii) the results of clinical trials Applied

Bio performed on its anti-viral nasal spray technology; (iii) the product development plan for Applied Bio's anti-viral nasal spray technology; (iv) Applied Bio's manufacturing plans for its anti-viral nasal spray technology; (v) Applied Bio's costing, pricing, and labelling information for its anti-viral nasal spray technology; (vi) Applied Bio's sales and marketing plan and target retail accounts for its anti-viral nasal spray technology; (vii) Applied Bio's agreements with the contract manufacturing organizations that then provided Applied Bio with pharmaceutical development services from drug development through drug manufacturing; (viii) Applied Bio's supply chain information, including a list of suppliers, prices, and key contract terms; (ix) Applied Bio's strategic relationship information, including the names of the companies with whom Applied Bio was developing business relationships to exploit its anti-viral nasal spray technology; (x) employment information, including a list of all existing employees; the employees' salaries, hiring dates, and roles; the accounts associated with each member of Applied Bio's sales team; the individuals earmarked for future positions post funding; the open positions to be filled; and the budgets and salaries for future employees; and (xi) Applied Bio's research and exploration of "dead-end" concepts that ultimately proved ineffective, unsafe, too expensive, or otherwise unworkable for the mass market.

56.     Applied Bio has undertaken efforts that are reasonable under the circumstances to maintain the secrecy of the trade secrets at issue.  These efforts include, but are not limited to, the use of passwords and encryption to protect data on its computers, servers, and source code repositories; the maintenance of a Code of Conduct that emphasizes all employees' duties to maintain the secrecy of Applied Bio's confidential information; and the use of confidentiality agreements and non-disclosure agreements to require vendors, partners, contractors, and employees to maintain the secrecy of Applied Bio's confidential information. Due these security measures, Applied Bio's confidential and proprietary trade secret information is not available for others in the industry to use through any legitimate means.

ACTIVE 52817708v3

57.     Applied Bio's confidential, proprietary, and trade secret information derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by, another person who could obtain economic value from the disclosure or use of the information.

58.     Defendants knew or should have known under the circumstances that the information misappropriated by Defendants were trade secrets.

59.     Defendants misappropriated and threaten to further misappropriate trade secrets at least by acquiring trade secrets with knowledge of or reason to know that the trade secrets were acquired by improper means, and Defendants are using and threatening to use the trade secrets acquired by improper means without Applied Bio's knowledge or consent.

60.     As a direct and proximate result of Defendants' conduct, Applied Bio is threatened with injury and has been injured in an amount in excess of the jurisdictional minimum of this Court and that will be proven at trial. Applied Bio has also incurred, and will continue to incur, additional damages, costs and expenses, including attorney's fees, as a result of Defendants' misappropriation. As a further proximate result of the misappropriation and use of Applied Bio's trade secrets, Defendants were unjustly enriched.

61.     The aforementioned acts of Defendants were willful, malicious and fraudulent. Applied Bio is therefore entitled to exemplary damages under California Civil Code § 3426.3(c).

62.     Defendants' conduct constitutes transgressions of a continuing nature for which Applied Bio has no adequate remedy at law. Unless and until enjoined and restrained by order of this Court, Defendants will continue to retain and use Applied Bio's trade secret information to enrich themselves and divert business from Applied Bio. Pursuant to California Civil Code § 3426.2, Applied Bio is entitled to an injunction against the misappropriation and continued threatened misappropriation of trade secrets as alleged herein and further asks the Court to restrain Defendants from using all trade secret

information misappropriated from Applied Bio and to return all trade secret information to Applied Bio.

63. Pursuant to California Civil Code § 3426.4 and related law, Applied Bio is entitled to an award of attorneys' fees for Defendants' misappropriation of trade secrets.

## THIRD CAUSE OF ACTION

### Violation of California Bus. & Prof. Code § 17200

### Against All Defendants

64. Applied Bio incorporates all of the above paragraphs as though fully set forth herein.

65. Defendants engaged in unlawful, unfair, and fraudulent business acts and practices. Such acts and practices include, but are not limited to, misappropriating Applied Bio's confidential and proprietary information.

66. Defendants' business acts and practices were unlawful as described above.

67. Defendants' business acts and practices were fraudulent in that a reasonable person would likely be deceived by their material misrepresentations and omissions. Defendants have acquired and used Applied Bio's confidential and proprietary trade secret information through material misrepresentations and omissions.

68. Defendants' business acts and practices were unfair in that the substantial harm suffered by Applied Bio outweighs any justification that Defendants may have for engaging in those acts and practices.

69. Applied Bio has been harmed as a result of Defendants' unlawful, unfair, and fraudulent business acts and practices. Applied Bio is entitled to (a) recover restitution, including without limitation, all benefits that Defendants received as a result of their unlawful, unfair, and fraudulent business acts and practices; and (b) an injunction restraining Defendants from engaging in further acts of unfair competition.

ACTIVE 52817708v3

## VI.    PRAYER FOR RELIEF

WHEREFORE, Applied Bio respectfully requests the following relief:

1.    Judgement in Applied Bio's favor and against Defendants on all causes of action alleged herein;

2.    For all damages caused by Defendants' unlawful acts in an amount to be further proven at trial;

3.    For permanent injunctive relief;

4.    For exemplary and punitive damages as provided by law;

5.    For restitution;

6.    For costs of suit incurred herein;

7.    For prejudgment interest;

8.    For attorneys' fees and costs; and

9.    For such other and further relief as the Court may deem to be just and proper.

## VII.    DEMAND FOR JURY TRIAL

Applied Bio hereby demands trial by jury for all causes of action, claims, or issues in this action that are triable as a matter of right to a jury.


DATED: December 23, 2020          GREENBERG TRAURIG, LLP

By */s/ Colin W. Fraser*
Colin W. Fraser
Tyler R. Andrews

Attorneys for Plaintiff
APPLIED BIOLOGICAL LABORATORIES, INC.

ACTIVE 52817708v3