UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| APPLIED BIOLOGICAL LABORATORIES, INC., <br><br>Plaintiff,<br><br>v.<br><br>DIOMICS CORPORATION, a Delaware corporation; ANTHONY ZOLEZZI, an individual; and DOES 1-50, inclusive,<br><br>Defendants. | Case No.: 3:20-CV-2500-AJB-LL<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS**<br><br>**(Doc. No. 8)** |
|---|---|

Before the Court is Defendant Diomics Corporation and Defendant Anthony Zolezzi's ("Defendant Diomics" and "Defendant Zolezzi") motion to dismiss, (Doc. No. 8), Plaintiff Applied Biological Laboratories, Inc.'s ("Plaintiff") Complaint. (Doc. No. 1.) In the alternative, Defendants moves for a more definite statement. (Doc. No. 8.) Plaintiff opposed the motions, (Doc. No. 10), and Defendants replied. (Doc. No. 11.) For the reasons set forth below, the Court **DENIES** Defendants' motion to dismiss Counts I and II and **GRANTS** Defendants' motion to dismiss Count III.

## I.   BACKGROUND

Plaintiff brings this action against Defendants, alleging Defendants violated the

Defend Trade Secrets Act ("DTSA"), the California Uniform Trade Secrets Act ("CUTSA"), and the California Business & Professions Code § 17200 ("Section 17200"). (Doc. No. 1 at 1.)[1] Plaintiff asserts Defendants engaged in unfair competition and misappropriated Plaintiff's trade secrets relating to Plaintiff's antiviral nasal spray technology. (*Id.* ¶ 1.) Specifically, Plaintiff alleges Defendants used confidential, proprietary, and trade secret information obtained by Defendant Zolezzi through business negotiations with Plaintiff to launch a competing antiviral nasal spray product, DioGuard. (*Id.* ¶ 32.) Plaintiff also asserts its product has the potential to inactivate both rhinoviruses and novel respiratory pathogens such as COVID-19, making the product the first of its kind. (*Id.* ¶¶ 1, 20.) Plaintiff claims its product will address a significant unmet public health opportunity, and the market for antiviral nasal spray technology will develop rapidly. (*Id.* ¶¶ 2, 37.) Thus, Plaintiff contends its opportunities in such a market will be irreparably harmed by Defendants' alleged exploitation of stolen intellectual property. (*Id.* ¶ 37).

As background, Plaintiff is a biotechnical company specializing in healthcare products. (*Id.* ¶ 8.) For years, Plaintiff performed confidential research into the various mechanisms causing respiratory infections. (*Id.* ¶ 3.) Through this research, Plaintiff determined the primary pathway for pathogens to enter a host body is through aerosol droplets interacting with mucous membranes in an individual's nose and mouth. (*Id.* ¶ 18.) According to Plaintiff, traditional nasal saline sprays damage a body's epithelial barrier. (*Id.* ¶ 16.) Plaintiff sought to address this issue by inventing antiviral nasal spray technology which maintains a healthy nasal and esophageal microbiome. (*Id.* ¶¶ 2, 16.) By using naturally occurring protein molecules, Plaintiff designed its antiviral nasal spray to create a barrier between viral droplets and the exterior cells of the respiratory tract. (*Id.* ¶ 20.) Such a barrier prevents pathogens from binding to their target receptors. (*Id.*) The

---

[1] The page citations refer to the ECF-generated page numbers at the top of each filing.

natural ingredients in Plaintiff's product help control inflammatory responses and strengthen the epithelial barrier. (*Id.* ¶ 22.)

Plaintiff used the results of private scientific testing to create its product and accumulated confidential information on the marketability of such products through its development process. (*Id.* ¶¶ 21, 23.) The general information Plaintiff garnered includes: the implementation and manufacturing of its product to improve performance, safety, and costs; concepts proving ineffective, unsafe, too expensive, or otherwise unworkable for the mass market; "dead-end" concepts contributing to the ongoing development of Plaintiff's product and general antiviral nasal spray technology; details used in Plaintiff's product; and lessons learned from Plaintiff's years of research and development. (*Id.* ¶ 23.) Plaintiff alleges these materials constitute trade secrets highly valuable to Plaintiff and any competitor in the antiviral nasal spray market. (*Id.*)

In 2017, Plaintiff initiated business communications with private equity fund manager, Pegasus and its affiliate, PanTheryx (a nutrition and biotechnology company specializing in gastro-intestinal microbiome). (*Id.* ¶ 25.) Plaintiff inquired with Pegasus and PanTheryx on opportunities available to develop its antiviral nasal spray technology. (*Id.*) Defendant Zolezzi, employed as Pegasus's Operating Partner at the time, participated in the business negotiations. (*Id.*) All parties consented to non-disclosure agreements ("NDAs") safeguarding Plaintiff's private information. (*Id.* ¶ 26.)

In November 2017, Plaintiff granted Defendant Zolezzi, Craig Cogut (Pegasus's founder and Co-Managing Partner), and Pegasus's team of scientists, access to Plaintiff's secured computer systems and electronic document repositories. (*Id.* ¶¶ 27, 28.) These encrypted repositories contained confidential information concerning Plaintiff's scientific research, finances, and corporate organization. (*Id.* ¶ 27.) Plaintiff claims various trade secrets were housed in these files, such as "the formulations of its products and proposed products; its methods of manufacturing, developing, and producing products, proposed products, and the ingredients within them; the mechanism of action of Applied Bio's products, proposed products, and formulations; the non-public patent applications filed by

Applied Bio or its principles; information about every scientific test or study that Applied Bio has carried out; and the names of each supplier of ingredients for inclusion by Applied Bio in its products." (*Id.* ¶ 41.) In 2017, Plaintiff obtained a patent for components of its antiviral nasal spray which did not include the information stored in the aforementioned repository. (*Id.* ¶¶ 21, 42.)

During negotiations, Plaintiff and Defendant Zolezzi communicated directly with one another over the course of ten months. (*Id.* ¶ 29.) Plaintiff discussed the various proteins, ingredients, and research of its antiviral nasal spray technology with Defendant Zolezzi, Pegasus, and PanTheryx, including its use of immunoglobulin G ("IgG"). (*Id.*) Plaintiff alleges Defendant Zolezzi frequently asked questions regarding the proteins and ingredients Plaintiff used in its research. (*Id.*) In 2018, Plaintiff ceased negotiations with Pegasus, PanTheryx, and Defendant Zolezzi. (*Id.* ¶ 31.)

In March 2020, Defendant Diomics hired Defendant Zolezzi as its Chief Executive Officer. (*Id.* ¶ 32.) Plaintiff asserts Defendant Diomics originated as a developer of products to "collect and analyze biological samples." (*Id.*) In August 2020, Plaintiff maintains Defendant Diomics's website reflected a corporate focus on "a proprietary bio-polymer that captures biological material and delivers compounds to improve hearing, and a suite of rejuvenating biological compounds that deliver growth factors and healing cytokines." (*Id.* ¶ 34.) By September 2020, Plaintiff claims Defendant Diomics redeveloped its website to announce its "intra-nasal system that couples IgG antibodies with Diomat nanobeads to enable a passive prophylactic therapy." (*Id.*)

Concerned by Defendant Diomics's rapid shift in focus and launch of a new product line, Plaintiff conducted investigations from September 2020 to October 2020 into the events surrounding Defendant Zolezzi's acquisition of Plaintiff's intellectual property, Diomics's hiring of Defendant Zolezzi, and Diomics's development of DioGuard. (*Id.* ¶ 35.) Plaintiff contends Defendant Diomics had no previous experience in the field of nasal spray technology before hiring Defendant Zolezzi in March 2020. (*Id.* ¶ 32.) Plaintiff further alleges that Defendant Zolezzi's only experience with antiviral nasal spray

technology came from his confidential discussions with Plaintiff. (*Id.*)

## II.   LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) calls into question the legal sufficiency of the pleadings, requesting the court to dismiss a complaint after determining that it fails to state a cause of action upon which relief may be granted. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). The court may dismiss a complaint for lack of cognizable legal theory or insufficient facts under a cognizable legal claim. *See SmileCare Dental Grp. v. Delta Dental Plan of Cal.*, 88 F.3d 780, 783 (9th Cir. 1996). A complaint must allege sufficient facts "stat[ing] a claim to relief that is plausible on its face" to overcome a motion to dismiss. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The complaint must avoid restating legal "labels and conclusions" or a "formulaic recitation of elements." *Iqbal*, 556 U.S. at 678. When evaluating a Rule 12(b)(6) motion to dismiss, "all allegations of material fact are taken as true and construed in the light most favorable to plaintiff." *Smile Dental*, 88 F.3d at 782. A court should assume the veracity of "well-pleaded factual allegations" and "determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679.

## III.   DISCUSSION

### A.   DTSA and CUTSA Claims

Defendants move to dismiss Plaintiff's first and second causes of action. (Doc. No. 8 at 7–8.) Plaintiff's first cause of action alleges trade secret misappropriation in violation of the Defend Trade Secrets Act ("DTSA") enacted under 18 U.S.C. § 1836. (Doc. No. 1 ¶¶ 40–52.) Plaintiff's second claim assert a violation under the California Uniform Trade Secrets Act ("CUTSA"), using duplicate facts as those supporting Plaintiff's DTSA claim. (*Id.* ¶¶ 53–63.) The provisions between the CUTSA and DTSA are materially the same and may be analyzed consistently with one another. *See Deerpoint Group, Inc. v. Agrigenix, LLC*, 345 F. Supp. 3d 1207, 1227–28 (E.D. Cal. 2018). Therefore, the Court will analyze Plaintiff's first and second causes of actions as one.

Trade secret misappropriation claims under the DTSA require a plaintiff to plead:

"(1) the plaintiff owned a trade secret; (2) the defendant misappropriated the trade secret; and (3) the defendant's actions damaged the plaintiff." *Power Integrations, Inc. v. De Lara*, No. 20-CV-410-MMA (DEB), 2020 WL 4582675, 10 (S.D. Cal. Aug. 10, 2020). Courts generally require pleadings to be sufficient enough to grant the other party notice of what has been purported to be misappropriated. *See MAI Systems Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 522 (9th Cir. 1993). A plaintiff must also show how "improper acquisition, disclosure, or use occurred or is threatened." *Agency Solutions.Com, LLC v. TriZetto Grp., Inc.*, 819 F. Supp. 2d 1001, 1027 (E.D. Cal. 2011). A complaint may rely on circumstantial evidence of misappropriation while balancing such allegations with the standards of fair notice required under Rule 8. *See Droeger v. Welsh Sporting Goods Corp.,* 541 F.2d 790, 792 (9th Cir. 1976).

Defendants have not disputed the third element of trade secret misappropriation regarding the damaged value of Plaintiff's trade secret technology and competitive prospects. (Doc. No. 1 ¶¶ 36, 38.) Defendants do, however, contest the first element, claiming Plaintiff did not allege which trade secrets Defendants used, or how the trade secrets were used in developing Defendants' new product. (Doc. No. 8 at 8). Defendants similarly challenge the second element, asserting Plaintiff's circumstantial evidence is insufficient to show how Defendants acquired, disclosed, or used Plaintiff's trade secrets. (Doc. No. 11 at 3.) The Court disagrees with Defendants' conclusions. The Court finds that at the motion to dismiss stage, the information Plaintiff provided is sufficient to plead trade misappropriation.

### 1. Plaintiff's Trade Secrets

Regarding the first element of trade secret misappropriation, Defendants claim Plaintiff did not sufficiently plead which trade secrets were used, or how they were used. (Doc. No. 8 at 8.) The Court finds Defendants' arguments inadequate. Plaintiff explicitly mentions in the Complaint that "[Defendant] Zolezzi . . . improperly disclosed to [Defendant] Diomics the results of Applied Bio's resource-intensive research." (Doc. No. 1 ¶ 5.) Plaintiff also alleges, "Defendants Diomics and Zolezzi have taken Applied Bio's

intellectual property so they could avoid incurring the risk, time, and expense of independently developing their own technology." (*Id.* ¶ 1.) "Misappropriation includes not only wholesale pirating of an ideas, but also the unauthorized utilization of an idea as a starting point or guide in developing a process or as a means to understand what pitfalls to avoid." *Yeiser Research & Development LLC v. Teknor Apex Company,* 281 F. Supp. 3d 1021, 1047 (S.D. Cal. 2017).

Furthermore, Plaintiff explicitly claims that Defendants used Plaintiff's trade secrets to launch DioGuard, an antiviral nasal spray. (Doc. No. 1 ¶ 32, 35.) The trade secrets Plaintiff claims were used relate to Plaintiff's scientific expertise, the mechanism of action in its products, the product's ingredients, and the "dead-ends" in their research. (*Id*. ¶¶ 23, 29, 41.) Furthermore, Plaintiff states that in its business negotiations with Defendant Zolezzi and Pegasus, it mentioned the use of IgG in Plaintiff's research and development. (*Id*. ¶ 29.) Plaintiff alleges that Defendants' product, DioGuard, not only uses similar mechanisms to Plaintiff's product to inactivate similar viruses in similar pathogenic pathways, but does so with similar ingredients, namely IgG. (*Id*. ¶ 34.) Through what is alleged above, Plaintiff sufficiently pinpoints the nature of its trade secrets, as well as which trade secrets could have been misappropriated by Defendants. Therefore, Plaintiff plausibly pleads the first element of trade secret misappropriation.

### 2. Defendants' Misappropriation of Plaintiff's Trade Secrets

In regard to the second element of trade secret misappropriation, Plaintiff alleges sufficient circumstantial evidence demonstrating how Defendants could have acquired Plaintiff's trade secrets. The expedited nature of Defendants' development process in a field previously unknown to them raised concerns for Plaintiff regarding the misuse of trade secrets. (Doc. No. 1 ¶ 35.) Defendants liken these concerns to the concerns of the plaintiff in *Accenture Glob. Servs. GMBH v. Guidewire Software Inc.*, who alleged that the defendant "seemed to develop its products 'surprisingly quickly.'" 581 F. Supp. 2d 654, 663–64 (D. Del. 2008). The *Accenture* court was not persuaded by this fact, and this dismissed the trade secrets claim. But *Accenture* is distinguishable. The *Accenture* court

noted that the speed of Defendants' product development was of no import because the plaintiff did not present facts explaining how the defendants accessed the plaintiff's trade secrets, or how the trade secrets were used.

In contrast to *Accenture*, Plaintiff here alleges Defendants misappropriated the confidential information in Plaintiff's encrypted repositories to develop DioGuard, a similar antiviral nasal spray to Plaintiff's product. (Doc. No. 1 ¶ 27.) Plaintiff claims Defendant Zolezzi had access to confidential research files with information containing the tried-and-true development methods tested by Plaintiff for Plaintiff's own product. (*Id.* ¶¶ 27, 28.) This information is not included in Plaintiff's publicized patent information and were accessible to Defendant Zolezzi only during his business negotiations with Plaintiff. (*Id.*) Therefore, Plaintiff adequately pleads Defendant acquired Plaintiff's trade secrets from Plaintiff's encrypted repository, a storehouse Defendant Zolezzi had prior authorization to access.

Moreover, Plaintiff alleges Defendant Zolezzi did not know of antiviral nasal spray technology before conferring with Plaintiff through their private discussions. (*Id.* ¶ 32.) Plaintiff purports that Defendant Diomics also had no prior experience in the field of antiviral nasal sprays before beginning its work under Defendant Zolezzi. (*Id.* ¶ 35.) Plaintiff notes that Defendant Zolezzi had specific curiosity in Plaintiff's product development and research. (*Id.* ¶ 29.) This is analogous to *Yeiser Research & Dev. LLC v. Teknor Apex Co.*, wherein the court found that a defendant with no prior knowledge in an industry, who also expresses a curiosity toward the product the plaintiff was developing, is enough to plead misappropriation of trade secrets when the defendant develops a similar product. *See* 281 F. Supp. 3d at 1043–44.

Each of these facts work in concert to provide insight into which trade secrets were used and how Defendants used the trade secrets. Considering the covert nature of trade secret misappropriation, the exact means of knowing what was used is nearly impossible for Plaintiff to know without discovery. *See Accenture*, 581 F. Supp. 2d at 663 ("It is not common for a trade secret misappropriation plaintiff to know, prior to discovery, the details

surrounding the purported theft"). Defendants' contention that Plaintiff must affirmatively demonstrate how Defendant used its trade secrets is not feasible granted the realities of trade secret misappropriation at the pleading stage. To require Plaintiff to convey such a level of specificity in its pleadings would be unusual, if not unattainable.

Plaintiff has therefore provided sufficient grounds to plead a plausible claim that Defendants misappropriated Plaintiff's trade secrets to develop their product. Accordingly, the Court **DENIES** Defendants' motion to dismiss the first and second claim. Moreover, at the current pleadings stage, it is not feasible for Plaintiff to provide additional information into how Defendants acquired Plaintiff's trade secrets, or which trade secrets were used. The information given by Plaintiff sufficiently pleads circumstantial evidence allowing the Court to infer plausible bases for Plaintiff's trade secret misappropriation claim. Therefore, the Court also **DENIES** Defendants' motion for a more definite statement.

**B.    Plaintiff's § 17200 Unfair Competition Claim**

California law renders common law and statutory unfair competition claims "preempted under [§ 3426.7 of the CUTSA]" if the claim asserts the same "nucleus of facts" as the trade secret misappropriation claim. *See K.C. Multimedia, Inc. v. Bank of Am. Tech. & Operations, Inc.*, 171 Cal. App. 4th 939, 961 (2009). This is due to the exclusive nature of CUTSA's the civil remedy, which supersedes alternative civil remedies if identical facts are used "based upon misappropriation of a trade secret." *Erhart v. BofI Holding, Inc.*, No. 15-CV-02287-BAS-NLS, 2020 WL 1550207, at *36 (S.D. Cal. Mar. 31, 2020) (quoting *K.C. Multimedia*, 171 Cal. App. at 958)).

"[T]he determination of whether a claim is based on trade secret misappropriation is largely factual." *Angelica Textile Services, Inc. v. Park,* 220 Cal. App. 4th 495, 505 (2013), *as modified* (Oct. 29, 2013), *as modified on denial of reh'g* (Nov. 7, 2013). Therefore, statutory unfair competition claims relying solely on the factual allegations made for a trade secret misappropriation claim are preempted. *See K.C. Multimedia*, 171 Cal. App. at 962; *Anokiwave, Inc. v. Rebeiz*, No. 18-CV-629 JLS (MDD), 2018 WL 4407591, at *2

(S.D. Cal. Sept. 17, 2018) ("If there is no material distinction between the wrongdoing alleged . . . the CUTSA claim preempts the other claim.") (quoting *Convolve, Inc. v. Compaq Comp. Corp.*, No. 00 CV 5141 (GBD), 2006 WL 839022, at *6 (S.D.N.Y. Mar. 31, 2006) (applying California law)).

Plaintiff asserts in its opposition that its CUTSA claim relies on a different set of facts and legal theories and therefore does not preempt its § 17200 claim. (Doc. No. 10 at 21.) Plaintiff purports Defendants' lack of knowledge in the antiviral nasal spray industry will diminish credibility in Plaintiff's own product and jeopardize its marketability. (*Id.* at 16.) Plaintiff contends Defendants breached Plaintiff's NDA and confidence in Defendants. (*Id.*) Finally, Plaintiff asserts its § 17200 claim provides relief for confidential information which does not amount to a trade secret. (*Id.* at 17.) In response, Defendants challenges Plaintiff's use of a shotgun pleading, alleging that Plaintiff is attempting to recast its CUTSA allegations as a separate unfair competition claim. (Doc. No. 11 at 8.) Defendants claim Plaintiff fails to allege specific facts in support of unfair competition apart from facts shared with Plaintiff's allegation of trade secret misappropriation. (Doc. No. 8 at 9.) This Court agrees with Defendants.

A shotgun pleading incorporates all preceding paragraphs of a complaint into a cause of action. *Kennedy v. MUFG Union Bank,* 2020 WL 218521 at *6 (Cal. App. 4th Dist. 2020). It is impermissible if it "fails to connect its factual allegations to the elements comprising plaintiff's claims" and denies parties information on which allegations support each cause of action. *In re Metro. Sec. Litig.,* 532 F. Supp. 2d 1260, 1279–80 (E.D. Wash. 2007). Here, Plaintiff uses a shotgun pleading by way of the phrase "'incorporates all of the above paragraphs as though fully set forth herein'" to prelude its § 17200 cause of action. (Doc. No. 1 ¶ 64).

Through this shotgun pleading strategy, Plaintiff limits the contentions it uses for its § 17200 cause of action to paragraphs 1–64. (*Id.* ¶¶ 64–69.) Plaintiff does not allege distinct facts in its complaint that differentiate its § 17200 claim from its CUTSA claim. In its opposition, Plaintiff continues to use the same nucleus of facts to propose its alleged

alternative legal theories. (Doc. No. 10 at 15–17.) Plaintiff claims in its second cause of action that it used NDAs to maintain its trade secrets' confidentiality. (*Id.* ¶ 55.) Plaintiff later concedes in its opposition that it also relies on this fact to claim Defendants breached Plaintiff's confidence. (Doc. No. 10 at 16). Plaintiff similarly concedes an overlap in facts regarding Defendants' lack of prior experience in the antiviral nasal spray industry as a factor to claim misappropriation and unfair competition. (Doc. No. 10 at 11, 16.) Although Plaintiff may purport a difference between the theories, the nucleus of facts each theory relies upon remain the same.

In addition, Plaintiff's statements alleging its unfair competition claim is also comprised solely of conclusory statements. (Doc. No. 1 ¶¶ 65–69). Each sentence claims either "unlawful", "fraudulent", or "unfair" actions but does not enumerate which facts in paragraphs 1–64 support these conclusions. (*Id.*) Plaintiff's opposition to Defendants' motion to dismiss does not provide adequate clarification on this matter. From the framing of Plaintiff's unfair competition claim, Plaintiff has not alleged any factual allegations different from its CUTSA claim. The Court finds it beneficial to provide Plaintiff a chance to clarify its unfair competition claim and provide facts materially different from the facts asserted in its trade secret misappropriation claims to avoid preemption.

Therefore, the Court **GRANTS** Defendants' motion to dismiss the third claim and allows Plaintiff leave to amend.

## IV. CONCLUSION

Accordingly, for the reasons stated:

1. The Court **DENIES** Defendants motion to dismiss for the first and second claims for relief. (Doc. No. 8.) The Court also **DENIES** Defendants' motion for a more definite statement. (Doc. No. 8.)

2. The Court **GRANTS** Defendants' motion to dismiss for the third claim and permits Plaintiff **LEAVE TO AMEND**. (Doc. No. 8.) Should Plaintiff choose to

///
///

Case 3:20-cv-02500-AJB-LL   Document 21   Filed 09/07/21   PageID.129   Page 12 of 12

do so, this Amended Complaint is due by **September 20, 2021**.

**IT IS SO ORDERED.**

Dated: September 6, 2021

*[signature]*
Hon. Anthony J. Battaglia
United States District Judge

12

3:20-CV-2500-AJB-LL